**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Two Brothers Distributing Incorporated, et al., | No. CV-15-01509-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Valero Marketing and Supply Company, | |
| Defendant. | |

Plaintiffs Two Brothers Distributing, Inc. ("Two Brothers") and ten associated gasoline retailers (the "Station Plaintiffs") sued Defendant Valero Marketing and Supply Company ("Valero") asserting various claims. Doc. 29.[1] Valero has filed motions for summary judgment against Two Brothers and the Station Plaintiffs. Docs. 113, 114. The motions are fully briefed, and the Court heard oral argument on September 14, 2017. For the reasons that follow, the Court will grant Valero's motions.

## I. Background.

Most of the facts in this case are undisputed. Indeed, Two Brothers does not dispute 78 of the 93 paragraphs in Valero's Statement of Facts. *See* Docs. 115, 136. To ensure that the Court views the evidence in the light most favorable to Plaintiffs when

---

[1] The ten Station Plaintiffs are Two Brothers ("TB") II, TB III, TB IV, TB VI, TB VII, TB IX, TB X, TB XVI, One Brother 1, and Springwells & I-75 Inc.

ruling on Valero's motions for summary judgment, this background section is taken from Two Brothers' Statement of Facts. Doc. 136.

Valero Energy Corporation ("VEC") is a multinational public company that refines fuel and supplies branded and unbranded fuel to the Maricopa County market. *Id.* at 3, ¶ 4. Valero is a VEC subsidiary that sells fuel to distributors. *Id.* at 3, ¶ 5. Before May 1, 2013, VEC had several wholly-owned subsidiaries that sold fuel using either the name "Valero" or "Diamond Shamrock" at approximately 45 retail service stations in Maricopa County. *Id.* at 3, ¶ 6. Effective May 1, 2013, VEC spun off the wholly-owned stores to an entirely separate company, CST Brands Inc. *Id.* at 3, ¶ 7. VEC retained 20% of CST Brands' stock, but sold this 20% interest on November 14, 2015. *Id.* Valero and a subsidiary of CST Brands, CST Marketing and Supply Co. ("CST"), entered into a Master Agreement that became effective on May 1, 2013. *Id.* at 4, ¶ 8. The Master Agreement required CST to purchase annual minimum amounts of fuel from Valero in excess of one billion gallons. *Id.* at 4, ¶ 9. This fuel was to be sold at more than 1,000 CST stations across the country over the 15-year life of the Agreement. *Id.* Prices under the Master Agreement would be set in relation to daily changes in the U.S. commodities market, with several pricing exceptions that require the use of alternative pricing formulas if certain triggering events occurred. *Id.* at 5, ¶ 11.

Before 2007, brothers Saad Saad and Ali Saad had operated fuel stations in Maricopa County, including Arco and Mobil branded stations and several unbranded stations. *Id.* at 6, ¶ 13. Mobil decided to leave the Phoenix market in 2005, around the time the Saads learned that Valero intended to increase its share of the market. *Id.* at 30, ¶ 100. The Saads began talks with Valero in 2005 about selling Valero-branded fuel at their existing stations and opening several additional Valero stations. *Id.* at 31, ¶ 101. When Valero required the Saads to create a company to distribute Valero-branded fuels, the Saads created Two Brothers Distributing, Inc. *Id.* at 31, ¶¶ 103-04. In 2007, Two Brothers and Valero executed the first Branded Distributor Marketing Agreement ("DMA"), which was effective until 2010. *Id.* at 7, ¶ 15. The DMA contained an open

price term which stated that Two Brothers "shall pay to [Valero] that price specified by [Valero] from time to time." *Id.* The DMA allowed Two Brothers to use the Valero trademark and required Two Brothers to purchase certain minimum amounts of fuel. *Id.* at 8, ¶ 16. The DMA contained an integration clause stating that the DMA superseded any other agreements, representations, or promises not contained in the agreement, and required a signed writing to modify its terms. *Id.*

In 2007, Two Brothers and Valero also executed "Brand Conversion Incentive Agreements" that had a duration of ten years. *Id.* at 11, ¶ 25. These Conversion Agreements provided that Valero would pay upfront costs to brand six of the Station Plaintiffs; that Valero would pay Two Brothers incentive payments of two to four cents per gallon for four years to reward Two Brothers for purchasing 85% of the contracted fuel amount; and a repayment schedule for some of the branding costs and incentive payments. *Id.* at 12, ¶ 26. Valero eventually reduced the amount of fuel Two Brothers had to purchase to receive the incentive payments and provided Two Brothers with funds for station improvements. *Id.* at 12, ¶¶ 27, 29.

Two Brothers first purchased fuel from Valero in June 2007, and almost immediately began complaining that Valero's prices were too high in relation to other suppliers such as Arco and Shell. *Id.* at 18, ¶ 50. Valero responded with letters explaining that it intended to set its prices so that, on average, Valero's rack price would be competitive with other brands in the market. *Id.* at 18-19, ¶ 51. Throughout the duration of the DMAs, Valero charged Two Brothers its daily posted rack price minus discounts. *Id.* at 8, ¶ 39. Two Brothers continued to complain about Valero's prices in 2008, 2009, and 2010, and yet executed three new Conversion Agreements for three additional stations in 2008. *Id.* at 19-20, ¶¶ 52, 54. In 2010, Two Brothers and Valero entered into another DMA that was identical to the 2007 DMA in all material respects, including the pricing provision and integration clause. *Id.* at 20, ¶ 58. Two Brothers sought changes to a 2013 DMA, those changes were rejected by Valero, and Two

1    Brothers and Valero ultimately signed materially identical DMAs in 2013 and 2016. *Id.*

2    at 22-24, ¶¶ 64-66, 69. Two Brothers continues to operate under the 2016 DMA.

3    Starting in 2010, all but two of the Station Plaintiffs filed for bankruptcy. *Id.* at

4    24, ¶ 70. Several subsequently closed and were sold, but five continue to sell Valero fuel.

5    *Id.* at 24-25, ¶¶ 71-75.

6    The Saad brothers act as officers and directors for Two Brothers and the Station

7    Plaintiffs. They own Two Brothers and, until mid-2011, owned all of the Station

8    Plaintiffs. *Id.* at 13, ¶¶ 31-32.[2] In 2011, the Saad brothers transferred their shares of the

9    Station Plaintiffs to family members. *Id.*

10   Plaintiffs and Valero have presented contradicting expert opinions concerning the

11   fuel prices Valero charged Two Brothers, CST, and the Valero-owned stores.[3] Valero's

12   expert found that Two Brothers was charged less for fuel than both CST and the Valero-

13   owned stores over the life of the DMAs. Plaintiffs' expert found that Valero charged

14   Two Brothers more for fuel than CST and the Valero-owned stores. The experts criticize

15   each other's methodologies, and Valero has filed a *Daubert* motion asking the Court to

16   exclude the opinion of Plaintiffs' expert. *See* Docs. 112, 124, 124-2, 131. For purposes

17   of this order, the Court will assume there is a factual dispute as to whether Two Brothers

18   was charged more for fuel than CST and the Valero-owned stores. Given that

19   assumption, the Court need not decide Valero's *Daubert* motion in order to resolve the

20   motions for summary judgment.

21   **II.   Legal Standard.**

22   A party seeking summary judgment "bears the initial responsibility of informing

23   the district court of the basis for its motion, and identifying those portions of [the record]

24   which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

25   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the

26   evidence, viewed in the light most favorable to the nonmoving party, shows "that there is

27   ────────────
     [2] TB XVI also had two minority owners from 1998 through 2013. *Id.* at 13, ¶ 31.

28   [3] Valero asserts that it did not "sell" fuel to its own stores, but transferred fuel to
     those stores at certain internal transfer prices. *See* Doc. 113 at 18 n.14.

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. Two Brothers' Claims.

Two Brothers brings several claims based on Valero's pricing of its fuel in Maricopa County. Two Brothers alleges that Valero induced it to enter into a business relationship by making oral representations about how it would price its fuel, but ultimately did not price its fuel in accordance with those representations. Doc. 136 at 25, 31-33, ¶¶ 76, 108-11. Two Brothers also contends that Valero charged it higher prices than CST in order to favor CST and drive Two Brothers out of the market. *Id.* at 26, ¶ 78. These higher prices, according to Two Brothers, prevented it from competing with Valero-owned stores, CST stores, or even other similarly-situated brands. *Id.* at 36, ¶ 132. If Valero had priced its fuel as represented, Two Brothers asserts, Two Brothers would have sold a larger volume of fuel and made higher profits. *Id.* at 37, ¶¶ 142-43. Two Brothers also alleges that Valero's discriminatory pricing of its fuel violated the Robinson-Patman Act ("RPA"). Doc. 29 at 23, ¶ 107.

### A. Count I – Breach of Contract.

The DMAs provide that Two Brothers "shall pay to [Valero] that price specified by [Valero] from time to time[.]" Doc. 115-2 at 114, ¶ 4(A). They do not otherwise explain or impose limitations on how Valero will set fuel prices. Because the express language of the DMAs does not require Valero to set its daily rack price in any particular manner, Valero argues, Two Brothers' breach of contract claim must fail. *Id.* at 11-12; *see also* Doc. 115-2 at 114, ¶ 4(A).

Two Brothers does not dispute that the language of the DMAs grants Valero the discretion to set the daily prices Two Brothers pays for fuel, or that the DMAs include no guarantees as to how Valero will set this price. Doc. 134 at 14; Doc. 136 at 7, ¶ 15.

Instead, Two Brothers alleges that in 2007 Valero made several oral representations regarding fuel prices under the DMAs. Doc. 29 at 7, ¶ 23; Doc. 136 at 31-33, ¶¶ 108-11. Two Brothers contends that Valero promised, among other things, that it would charge Two Brothers a fuel price in line with discount brand stations and Valero-owned stations so that Two Brothers stations would remain competitive and profitable. Doc. 136 at 31, ¶ 108. Valero denies making such representations, and argues that extrinsic evidence of oral representations is inadmissible to alter the terms of the DMAs. Doc. 113 at 12.

Because the parties have contracted for the sale of goods (petroleum), the Uniform Commercial Code ("U.C.C.") applies to their agreement. A.R.S. § 47-2102. Arizona's version of U.C.C. § 2-202 provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties *as a final expression of their agreement with respect to such terms as are included therein* may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> 1. By course of performance, course of dealing or usage of trade (§ 47-1303); and
>
> 2. By evidence of consistent additional terms unless the court finds the writing to have been intended also *as a complete and exclusive statement of the terms of the agreement*.

A.R.S. § 47-2202 (emphasis added).[4]

This statute requires two inquiries. First, did the parties intend the DMAs to be "a final expression of their agreement with respect to such terms as are included therein"? *Id.* If yes, then the DMAs cannot be contradicted by any prior oral agreements, but may be "explained or supplemented" by "course of performance," "course of dealing," "usage of trade," or evidence of "consistent additional terms." *Id.* Second, were the DMAs intended also to be "a complete and exclusive statement of the terms of the agreement"?

---

[4] Throughout the remainder of this order, the Court will cite solely to the Arizona version of the U.C.C. rather than to the corresponding U.C.C. section number.

If yes, then evidence of "consistent additional terms" cannot be considered, and Two Brothers is limited to "course of performance, course of dealing or usage of trade." *Id.*

Two Brothers argues that because the DMAs do not contain any pricing terms beyond designating Valero as the price-setter, the DMAs are "not fully integrated with respect to the[] pricing terms." Doc. 134 at 12. In language of the Arizona statute, the Court understands Two Brothers to be arguing that the DMAs are not "a final expression" of the parties' agreement with respect to terms included in the DMAs, such as price, and are not "a complete and exclusive statement of the terms of the agreement." A.R.S. § 47-2202. Thus, Two Brothers contends, evidence of additional non-conflicting price terms must be considered – specifically, the oral representations allegedly made by Valero.

The Court concludes that the DMAs are "a final expression" of the parties' agreement with respect to terms included in the DMAs, including price terms. *Id*. Two Brothers argues that the DMAs cannot be final because they include no final price term, but a contract for the sale of goods may have an open price term. In a statutory section titled "[o]pen price term," Arizona's U.C.C provides that "[t]he parties if they so intend can conclude a contract for sale even though the price is not settled." A.R.S. § 47-2305(A). The statute recognizes that such contracts can provide that the sale price will be set by the seller, and states that, in such cases, the seller must set the price in good faith. § 47-2305(B). Thus, the fact that the DMAs provide for fuel prices to be set by Valero does not indicate that the DMAs are not a final expression of the parties' agreement. *See T.A.M., Inc. v. Gulf Oil Corp.*, 553 F. Supp. 499, 509 (E.D. Pa. 1982).

Indeed, open price terms are a common contract feature in the petroleum industry. As one court has noted, "[o]pen-price-term contracts are commonly used in the gasoline refining and marketing industry due to price volatility." *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 431 (Tex. 2004); *see also T.A.M, Inc.*, 553 F. Supp. at 509 ("Considering the nature of the petroleum market, and the length of time for which the contracts were to run, it appears quite clear that the parties had no options but to operate on an open price basis."). A respected U.C.C. commentary agrees:

For reasons that are partly historical and partly driven by the modern market for gasoline, sellers of oil and of oil derivatives such as gasoline have traditionally agreed to sell at a "posted price." In the earliest days of oil production, this was apparently a price on a note nailed to a post in an oil field. More recently, it is the price, disclosed on a Web site, which a gasoline wholesaler offers to retail gas stations. Of course, this is a price to be fixed by the seller under 2-305(2) and so must be fixed in "good faith."

1 White, Summers, & Hillman, Uniform Commercial Code § 4:15 (6th ed.).

The parties agree that such posted prices are used in the Phoenix market. Valero explains that petroleum suppliers such as ExxonMobil, Shell, Chevron, and Valero set daily rack prices with the Oil Price Information Service that are then charged to distributors. Doc. 115 at 2, ¶¶ 1-3. Two Brothers agrees. Doc. 136 at 2, ¶¶ 1-3. Given this well-established practice, the fact that the DMAs contain an open price term does not support a finding that the agreements are incomplete. Rather, this practice explains why a contract for the purchase of petroleum is complete despite an open price term.

The only other evidence cited by Two Brothers to show that the DMAs are incomplete are the oral representations allegedly made by Valero employees before the first DMA was signed in 2007. But even if the Court assumes for purposes of this order that these alleged oral representations were actually made, paragraph 23 of the DMAs makes clear that they did not become part of the parties' contract:

This Agreement, including the exhibits hereto, constitutes the entire agreement and understanding between [Two Brothers] and [Valero] with respect to the matters covered hereby. There are no representations, stipulations, warranties, agreements or understandings with respect to the subject matter of this Agreement which are not fully expressed herein and which are not superseded hereby. The provisions of this Agreement shall not be reformed, altered, or modified in any way by any practice or course of dealing prior to or during the term of this Agreement, and can only be reformed, altered, or modified by a writing signed by [Two Brothers] and an officer of [Valero] (except as otherwise expressly provided herein). [Two Brothers] specifically acknowledges that [Two Brothers] has not been induced to enter into this Agreement by any representation, stipulation, warranty, agreement, or understanding of any kind other than as expressed herein.

Doc. 115-2 at 126, ¶ 23.

This language is clear – the DMAs constitute the entire agreement between the parties. Paragraph 23, which Two Brothers signed on four separate occasions from 2007 to 2016, including after Valero made clear that its price-setting discretion was not limited by any alleged oral representations, states expressly that any other representations, agreements, or understandings are not part of the DMAs. Two Brothers identifies nothing in the DMAs which suggests that Valero's discretion to set prices is limited by terms outside the written agreements. Nor is there anything in the DMAs to suggest that further negotiations were anticipated. Because paragraph 23 makes clear that all terms are fully expressed in the DMAs, the Court concludes that the DMAs are a final expression of the parties' agreement within the meaning of § 47-2202.[5]

Two Brothers argues that Valero's alleged oral representations may be used to interpret the DMAs even if the DMAs are fully integrated. Doc. 134 at 13. As noted above, § 47-2202 provides that a contract that includes a "final expression" of the parties' agreement may be "explained or supplemented" by course of performance, course of dealing, usage of trade, or evidence of consistent additional terms. But the last category – evidence of consistent additional terms – is not available if the agreement is "a complete and exclusive statement of the terms of the agreement." A.R.S. § 47-2202(2).

Given the clear terms of paragraph 23 and the fact that all four of the parties' DMAs include the same language, the Court concludes that the DMAs constitute "a complete and exclusive statement of the terms of the agreement." *Id.*; *see Shore Line Props., Inc. v. Deer-O-Paints & Chems., Ltd.*, 538 P.2d 760, 763 (Ariz. 1975) ("whether

---

[5] Two Brothers argues that the alleged representations as to how Valero would fix petroleum prices were made before the 2007 DMA was finalized. Even if Two Brothers also contended that representations were made after the 2007 DMA, any amendment to the agreement had to be in writing. Doc. 115-2 at 126, ¶ 23; A.R.S. § 47-2209 ("A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.").

a writing was intended as a complete and exclusive statement of the terms of a contract is for the court to decide") (applying earlier version of A.R.S. § 47-2202). As a result, the DMAs may be "explained or supplemented" only by "course of performance, course of dealing or usage of trade." A.R.S. § 47-2202(1).

Valero's alleged oral representations do not constitute a course of performance, course of dealing, or usage of trade. "A 'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if: 1. The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and 2. The other party, with knowledge of the nature of the performance and the opportunity for objection to it, accepts the performance or acquiesces in it without objection." A.R.S. § 47-1303(A). "A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." § 47-1303(B). "A 'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." § 47-1303(C). Two Brothers does not rely on any of these; it does not contend that limitations were placed on Valero's price-setting discretion by a course of performance in a particular transaction, a course of dealing in previous transactions, or a usage of trade in the industry. Rather, Two Brothers relies on oral statements allegedly made by Valero before the parties engaged in any transaction. Under the statute, those oral representations cannot be used to explain or supplement the DMAs. § 47-2202(2).

What is more, even if the Court disregards § 47-2202(2) and looks to Arizona's traditional parol evidence rule, Two Brothers cannot prevail. Arizona applies a liberal version of the parol evidence rule; it does not require that a court find an agreement ambiguous before considering parol evidence. Instead, "the judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to

determine the meaning intended by the parties." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1140 (Ariz. 1993). If the contract language is not reasonably susceptible to the proffered interpretation, the court should disregard the evidence. *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 761 (D. Ariz. 2013), *aff'd,* 818 F.3d 549 (9th Cir. 2016). "A proffered interpretation that is highly improbable would necessarily require very convincing evidence. In such a case, the judge might quickly decide that the contract language is not reasonably susceptible to the asserted meaning, stop listening to evidence supporting it, and rule that its admission would violate the parol evidence rule." *Taylor*, 854 P.2d at 1141.

Two Brothers asserts, without explanation, that Valero's alleged oral statements about price setting "do not contradict or vary the terms of the [DMAs]. Instead, they explain the parties' intentions and the meaning of the agreements' price term." Doc. 134 at 14. Two Brothers contends that although Valero has discretion to set petroleum prices under the DMAs, that discretion is limited by Valero's own representations that it would set prices (1) below or consistent with other suppliers, (2) consistent with the prices it charges its own and other stores, and (3) in a way that allows Two Brothers to remain competitive and profitable. *Id.*

Although "Arizona has adopted a permissive approach to the parol evidence rule, 'a proponent of parol evidence cannot completely escape the confines of the actual writing.'" *Valento v. Valento*, 240 P.3d 1239, 1245 (Ariz. Ct. App. 2010). The DMAs state that Valero will set the fuel prices to be charged to Two Brothers. Doc. 115-2 at 114, ¶ 4(A). As noted above, such an open price term is permitted by A.R.S. § 47-2305(A) and consistent with practices in the petroleum marketing industry. The DMAs provide no other explanation, representation, or equivocation as to the price term, and they expressly disavow and supersede any prior representations regarding the subject matter of the DMAs. Doc. 115-2 at 126, ¶ 23. The Court cannot conclude that an agreement which expressly authorizes the seller to set prices, as is permitted by Arizona statute, and which expressly disavows any prior representations between the parties, is

reasonably susceptible to an interpretation that adopts prior representations. Such an interpretation is directly contrary to the language of the DMAs.

Moreover, a commitment to set prices consistent with competitor suppliers and at levels that would ensure that Two Brothers would remain competitive and profitable would bind Valero to significant and unknown future burdens that depend on factors beyond Valero's control. Such a significant obligation seems "highly improbable" and therefore calls for even more convincing evidence. *Taylor*, 854 P.2d at 1141. One would expect such a commitment to be explicitly contained in the language of the DMAs if the parties intended to include it. This is particularly true in light of the history of the parties' dealings on this issue: Two Brothers repeatedly complained that the oral representations were not being followed, Valero consistently replied that there were no such representations in the parties' contract, and the parties nonetheless proceeded to execute exactly the same DMAs with exactly the same disclaimer of prior representations in 2010, 2013, and 2016.

The Court concludes that the DMAs are not reasonably susceptible to the interpretation suggested by Two Brothers' proposed parol evidence, and therefore will disregard that evidence. *Tohono O'odham Nation*, 944 F. Supp. 2d at 761; *see also Taylor v. Graham Cty. Chamber of Commerce*, 33 P.3d 518, 530 (Ariz. Ct. App. 2001) ("parol evidence is not admissible to supply a missing term or to vary or contradict" express terms). Two Brothers has not otherwise provided evidence that Valero violated any express term of the DMAs. The Court will grant summary judgment to Valero on Count I.

### B. Count II – Open Price Term and Good Faith.

As already noted, when a contract provides for a price to be fixed by the seller, the seller must set the price in good faith. A.R.S. § 47-2305(B). Two Brothers contends that Valero violated this requirement when it set the price of fuel under the DMAs. Doc. 134 at 14-17.

Courts have recognized that the treatment of "good faith" is not uniform throughout the various provisions of the U.C.C., *see Mathis v. Exxon Corp.*, 302 F.3d 448, 456 (5th Cir. 2002), *Casserlie v. Shell Oil Co.*, 902 N.E.2d 1, 4 (Ohio 2009), and neither the Ninth Circuit nor any Arizona federal or state court has addressed the proper interpretation of good faith in the context of price setting pursuant to open price terms. As a result, the Court will look to other sources for guidance.[6]

A.R.S. § 47-2305 adopts the corresponding U.C.C. provision (§ 2-305) verbatim. Official Comment 3 to that provision affords a starting point for the meaning of good faith in the context of open price terms:

> [The UCC provision] dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2-103). But in the normal case a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

U.C.C. § 2-305 cmt. n.3 (2016).

As will be discussed in more detail below, courts agree that the last sentence of this comment creates a safe harbor. In the "normal case," evidence that a seller charged the regularly posted price will place the seller in the safe harbor and satisfy the requirement of good faith. *Id.* Courts are split, however, on what is required to overcome the presumption of good faith created by the safe harbor.

---

[6] The Ninth Circuit considered good faith price setting in *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772 (9th Cir. 1981). *Nanakuli* found that the price was not set in good faith because the buyer was not given adequate notice of price changes in accordance with commercially reasonable standards in the industry. *Id.* at 805. The dispute "was not over the amount of the increase – that is, the price that the seller fixed – but over the manner in which that increase was put into effect." *Id.* Because Two Brothers challenges the amount rather than the manner of price setting in this case, *Nanakuli* does not provide useful guidance.

On the majority side of the split, a claimant may push a case out of the safe harbor only by showing that a posted price was set with objective bad faith – that the price was either discriminatory or not commercially reasonable. *See HRN, Inc.*, 144 S.W.3d at 434 ("the majority of decisions suggest that a commercially reasonable [fuel] price, that is, one within the range of [fuel] prices charged by other refiners in the market, is a good faith price under section 2.305 absent some evidence that the refiner used pricing to discriminate among its purchasers.") (citing cases). A minority of courts holds that a case falls outside the safe harbor if a claimant shows the posted price was set with subjective bad faith in the form of improper motive. *See Marcoux v. Shell Oil Prod. Co. LLC*, 524 F.3d 33 (1st Cir. 2008), *aff'd in part, rev'd in part and remanded sub nom. Mac's Shell Serv., Inc. v. Shell Oil Prod. Co. LLC*, 559 U.S. 175 (2010) (applying Massachusetts law); *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308 (S.D. Fla. 1999) (*Allapattah II*) (applying Florida law).

The Court need not decide which approach Arizona would follow because Two Brothers' argument fails under both approaches. In arguing that Valero engaged in bad faith under § 47-2305, Two Brothers presents no evidence that Valero's rack price was commercially unreasonable. To the contrary, Two Brothers' expert, Ron Santicola, agreed that Valero pricing "fell into a range that could be considered competitive." Doc. 93-2 at 18, ¶ 39. And Two Brothers' response to the summary judgment motion made clear that it does not contend that Valero's prices were commercially unreasonable. *See* Doc. 134 at 15 ("Contrary to [Valero's] argument, *commercial reasonableness* is not the only test for good faith under § 47-2305. That statute can also be violated by *subjective bad faith*.") (emphasis in original). Because the commercial reasonableness of Valero's fuel prices is not disputed in this case, Two Brothers can show that Valero's pricing falls outside the safe harbor of § 47-2305 only if it was discriminatory or exercised in subjective bad faith.

Two Brothers contends that Valero sold fuel to Two Brothers at a higher price than it charged its own stores and CST, with the purpose of pricing Two Brothers and the

Station Plaintiffs out of the market. Doc. 134 at 16-17. Although it appears that Two Brothers intends this only as a showing of subjective bad faith, it could also be construed as discriminatory pricing. The Court accordingly will address both possibilities.

Discriminatory pricing requires similarly situated buyers. *See Mathis*, 302 F.3d at 457 ("price discrimination is [] the most obvious way a price-setter acts in bad faith – by treating similarly-situated buyers differently"); *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1346-47 (D. Kan. 1996), *aff'd*, 145 F.3d 1347 (10th Cir. 1998) ("It is abundantly clear from these statements that the chief concern of the UCC Drafting Committee in adopting § 2-305(2) was to prevent *discriminatory* pricing – i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons.") (emphasis in original); *Casserlie*, 902 N.E.2d at 6 (good faith is satisfied by a price that is "nondiscriminatory among similarly situated buyers"); *HRN, Inc.*, 144 S.W.3d at 433-36 (a price is non-discriminatory when it is applied uniformly to similarly-situated purchasers).

Charging different prices to differently situated buyers does not constitute bad faith under § 47-2305. *Id.* at 437-38 (branded and unbranded jobbers who pick up their gasoline at terminals, open dealers who own their own premises, and company-owned stores operated by other refiners are not similarly situated); *see also Ajir v. Exxon Corp.*, No. C 93-20830 RMW, 1995 WL 261412, at *4 (N.D. Cal. May 2, 1995), *aff'd,* 185 F.3d 865 (9th Cir. 1999) (The "existence of different prices for different classes of trade is not sufficient to demonstrate that Exxon is overcharging plaintiffs for gasoline."); *Casserlie*, 902 N.E.2d at 7 ("The disparate pricing between jobbers and dealers is not evidence of discrimination."); *Tom-Lin Enters., Inc. v. Sunoco, Inc. (R&M)*, 349 F.3d 277, 285 (6th Cir. 2003) (same).

Two Brothers does not argue that it is similarly situated to the Valero-owned stations that acquired fuel from Valero before May 1, 2013 (Doc. 134 at 17), and for good reason. Those stations did not, like Two Brothers, lease the Valero brand name (they already were part of the business that owned the name), did not sign contracts with

Valero, did not receive discounts from Valero, and did not buy branded fuel from Valero in an arm's length transaction. Courts have treated such integrated businesses as different from distributors like Two Brothers. *See HRN, Inc.*, 144 S.W.3d at 437-38 (branded distributors who pick up fuel at the terminal to supply their stations are in different class of trade from supplier-operated stations); *accord Ajir*, 1995 WL 261412 (distributors and retailers are in different classes of trade).

Nor is Two Brothers similarly situated to CST. CST came into existence on May 1, 2013. Doc. 136 at 3, ¶ 7. The relationship between Valero and CST is governed by a Master Agreement that has a life of 15 years. *Id.* at 4, ¶ 8. Each year during that 15-year period, CST is required to purchase a minimum amount of fuel from Valero. *Id.* at 4, ¶ 9. This minimum amount exceeds one billion gallons annually, and the Master Agreement provides for penalties if it is not met. *Id.* The fuel is to be sold in over 1,000 CST-owned stores across the country. *Id.* If CST decides to convert any stores to the Valero brand, it must – unlike Two Brothers – pay the costs of conversion unless a separate written agreement provides otherwise. *Id.* at 4, ¶ 10. The Master Agreement establishes a formula to set fuel prices in relation to daily changes in the U.S. commodities market, but provides exceptions for certain regional markets including Phoenix. *Id.* at 5, ¶ 11. The recitals to the Master Agreement explain that Valero agreed to certain terms as consideration for CST's commitment to purchase the volume of fuel required by the contract. *Id.* at 5, ¶ 12.

In contrast, the DMAs between Valero and Two Brothers each lasts three years. At its highest volume, Two Brothers was purchasing fuel and distributing it to ten stations, all located in Maricopa County. Valero provided funding for station conversion and station upgrades. Two Brothers was required to purchase substantially less fuel than CST. The 2010 DMA, for example, required Two Brothers to purchase not less than 85% and not more than 115% of the amount of fuel shown on Exhibit A – 9,730,050 gallons. Doc. 115-2 at 113, 218-19.

Two Brothers acknowledges the cases holding that discriminatory pricing requires similarly-situated purchasers (Doc. 134 at 170), but does not argue that it is similarly situated to either the Valero-owned stores or the CST stores for purposes of § 47-2305. Instead, Two Brothers argues that Valero acted with subjective bad faith, making this something other than the "normal case" referred to in Comment 3 to § 47-2305 and taking this case out of the safe harbor. Doc. 134 at 15-17.[7]

Two Brothers' subjective bad faith claim, however, is premised entirely on Valero's failure to abide by the alleged oral representations that are not part of the DMAs. Two Brothers presents no other evidence. This is its argument:

> There is evidence from which a rational jury could conclude that [Valero] acted in subjective bad faith under § 47-2305 in the manner in which it priced fuel to [Two Brothers]. Specifically, a rational jury could conclude that [Valero] sold fuel to [Two Brothers] at a higher price than it sold fuel to its own stores and to CST, *contrary to its promises*. And a rational jury could conclude that [Valero] priced fuel to [Two Brothers] at rates that did not allow [Two Brothers] to compete with the Valero-owned stores and later the CST stores, or even other similarly-situated brands, *contrary to its promises*. Thus a rational jury could conclude that [Valero] used [Two Brothers] to introduce the Valero brand into the Phoenix market, and once it did, engaged in a campaign to drive [Two Brothers] out of the market.

Doc. 134 at 15-16 (emphasis added; record citations omitted).

Because the alleged oral representations are not part of the parties' DMAs, and in fact were expressly disavowed by those agreements, the Court cannot conclude that Valero's failure to abide by them constitutes subjective bad faith. A party permitted by a contract to set prices does not act in subjective bad faith simply by failing to comply with limitations that are not part of the agreement between the parties. In the execution of four successive DMAs – 2007, 2010, 2013, and 2016 – Two Brothers agreed that the alleged oral representations were *not* part of the fuel-purchase contracts between the parties.

---

[7] Two Brothers later argues that it and CST are similarly situated for purposes of the RPA. Doc. 134 at 17. The Court will address that argument below.

Although Two Brothers alleges that a jury could conclude that Valero intended to use Two Brothers to introduce the Valero brand into the Phoenix market and then to drive Two Brothers out of business, Two Brothers presents no evidence of this fact other than the alleged oral representations. And even the minority of courts that recognizes subjective bad faith as sufficient to defeat the safe harbor of § 47-2305 requires more than a simple allegation of improper motive. *See Mathis*, 302 F.3d at 457 (subjective bad faith cannot be established "only on an allegation of improper motive by the party setting the price"); *Marcoux*, 524 F.3d at 51 ("Mere allegations of bad faith will never be enough to survive summary judgment."); *Flagler Auto., Inc. v. Exxon Mobil Corp.*, 582 F. Supp. 2d 367, 380-81 (E.D. N.Y. 2008) (supplier did not breach its good-faith duty in setting open-price terms by recouping rebate costs through pricing where plaintiffs produced no evidence of dishonesty or commercial unreasonableness); *Wayman*, 923 F. Supp. at 1349 (declining to find bad faith but noting that "[i]f there was evidence that Amoco had . . . tried to run plaintiffs out of business, then the court's decision might be different").

In *Mathis*, plaintiffs provided evidence that Exxon had charged them more than the sum of the rack price and transportation costs for gas delivered to their stations, that a number of franchisees were unprofitable or non-competitive, and that Exxon prevented the franchisees from purchasing gas from jobbers. 302 F.3d at 457-58. But this was not all. The plaintiffs also provided evidence that Exxon planned to replace a number of its franchisees with company-operated retail stores. *Id.* For example, the plaintiffs presented several Exxon documents showing Exxon's marketing strategy to reduce franchisee stores and replace them with company stores. *Id.* at 458. These documents constituted sufficient evidence from which the jury could draw the inference that Exxon used pricing to eliminate the franchisees. *Id.*

Two Brothers presents no such evidence. Two Brothers provides no evidence that Valero or CST attempted to acquire any of Two Brothers' closed stations or otherwise sought to occupy their territory. Two Brothers does provide a declaration from Saad Saad stating that he and his brother "were able to observe that [Valero] routinely sold fuel

to the Valero-owned stations and later to CST at prices that allowed those stations to retail price lower than [Two Brothers] was paying for wholesale fuel." Doc. 136-1 at 6, ¶ 21. But the declaration provides no explanation of how Mr. Saad and his brother made this observation or what evidence they had of different pricing for Valero-owned stations and CST. *Id.* As the Ninth Circuit has noted repeatedly, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). "When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993); *accord Am. Fed'n of State v. Nevada ex rel. Dep't of Corr.*, 460 F. App'x 688, 690 (9th Cir. 2011).

In addition, Mr. Saad's declaration simply restates the allegation of price discrimination that is rejected above because CST and Valero-owned stores were not similarly situated. CST is a national operator that entered a 15-year contract to purchase and sell more than a billion gallons annually in 1,000 stations across the country. *See* Doc. 113 at 18; Doc. 136 at 4, ¶ 9. And Valero-owned stores had no contract with their parent and therefore were not similarly situated to Two Brothers and its DMAs.

At bottom, Two Brothers is forced to argue that Valero's subjective bad faith is shown by the fact that it charged Two Brothers more than it charged differently situated stores, even though the price charged Two Brothers was publicly posted and commercially reasonable. That position simply is not tenable. As the Supreme Court of Texas reasoned with respect to § 47-2305:

> Beyond prohibiting discriminatory pricing, the drafters wished to minimize judicial intrusion into the setting of prices under open-price-term contracts. They understood that requiring sellers in open-price industries, such as the oil and gas industry, to justify the reasonableness of their prices in order to satisfy section 2.305 would "mean[ ] that in every case the seller is going to be in a lawsuit" and that every sales contract would become "a public utility rate case." Walter D. Malcolm, *The Proposed Commercial Code: A*

- 19 -

*Report on Developments from May 1950 through February 1951,* 6 Bus. Law. 113, 186 (1951). The drafters reasonably foresaw that almost any price could be attacked unless it benefitted from a strong presumption. Thus, they adopted a safe harbor, Comment 3's posted price presumption, to preserve the practice of using "sellers' standard prices" while seeking "to avoid discriminatory prices." *Id.*

*HRN, Inc.*, 144 S.W.3d at 435.

To allow Two Brothers' claim under § 47-2305 to continue to trial without any evidence of subjective bad faith other than Valero's charging a posted and commercially reasonable price that was higher than it charged differently situated stores would clearly undermine the U.C.C.'s attempt to establish objective standards by which to judge an open price contract. As one commentator aptly observed, "[t]he obligation of good faith in price setting does not impose an obligation on sellers to ensure the profitability of their buyers[.]" 1 White, Summers, & Hillman, Uniform Commercial Code § 4:15 (6th ed.).

Two Brothers relies most heavily on the decisions in *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1300 (S.D. Fla. 1999) (*Allapattah I*), *aff'd,* 333 F.3d 1248 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005), and *Allapattah II*, 61 F. Supp. 2d 1308. Those decisions, which arose out of the same case, are plainly distinguishable.

The case concerned allegations that Exxon was double charging its dealers for credit card processing fees. 61 F. Supp. 2d at 1322. After entering into a contract to sell fuel to the plaintiffs with an open price term, Exxon decided to implement a Discount for Cash program. Under this program, Exxon instituted a three percent processing fee on credit card tickets submitted by dealers, but simultaneously said it would reduce the wholesale price of the fuel to offset the increase. *Id.* at 1313. Evidence in the record supported the plaintiffs' assertion that Exxon actually double-charged dealers for credit card processing fees. *Id.* at 1322, 1324-35. Furthermore, Exxon concealed this double charge from the dealers, who lowered their prices in reliance on Exxon's representation. The court found that the plaintiffs had shown a breach of Exxon's obligation to set its

price in good faith, emphasizing that "[b]ecause the parties' dispute is not over the actual amount of the price Exxon charged for its wholesale gasoline to its dealers, but rather over the manner in which the wholesale price was calculated without considering the doubled charge for credit card processing, the instant action is not the 'normal' case [under § 2-305]." *Id.* at 1322; *see also HRN, Inc.*, 144 S.W.3d at 436.

Two Brothers does not allege that Valero acted dishonestly during the course of their relationship. The alleged oral representations about how Valero would price its fuel occurred before Two Brothers entered into the DMAs. Doc. 134 at 3. Once the DMA relationship began, Two Brothers began complaining that Valero's prices were too high. Doc. 136 at 18-19, ¶¶ 47-53. Two Brothers does not allege that Valero responded with any false statements about how it was establishing its prices. *Id.* at 18-19, ¶¶ 47-53. Rather, Valero responded by stating that it would price "competitive[ly] with other brand posters in the market." *Id.* As already noted, Two Brothers' expert concedes that Valero did so. *See* Doc. 93-2 at 18, ¶ 39 (conceding that Valero pricing "fell into a range that could be considered competitive"). A mere allegation of an unexpectedly high price, without more, does not establish bad faith. *See Allapattah II*, 61 F. Supp. 2d at 1321.[8]

Two Brothers has failed to present evidence that Valero set its prices in bad faith. The Court therefore will grant summary judgment on its claim of bad faith under § 47-2305. *Celotex*, 477 U.S. at 322.

**C.      Count III – Implied Covenant of Good Faith and Fair Dealing.**

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395*

---

[8] Two Brothers quotes *Allapattah I*: "Since compliance with the obligation to act in good faith requires that the party's actions be consistent with the agreed common purpose and justified expectations of the other party, the purpose, intentions and expectations of the parties may be determined by considering the language of the contract as well as the course of dealings between and conduct of the parties." 61 F. Supp. 2d at 1304. Even if this were viewed as an accurate summary of § 47-2202, Two Brothers has provided no evidence of any "course of dealings" or "conduct" that would justify its expectations about how Valero would set its prices.

*Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002). The implied covenant "prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Id.* The implied terms of the covenant are as much a part of the contract as the express terms, but they cannot directly contradict those express terms. *Kuehn v. Stanley*, 91 P.3d 346, 354 (Ariz. Ct. App. 2004); *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 (Ariz. Ct. App. 2002). "Thus, Arizona law recognizes that a party can breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Bike Fashion Corp.*, 46 P.3d at 435; *accord Wells Fargo Bank*, 38 P.3d at 30 ("[i]nstances inevitably arise where one party exercises discretion retained or unforeclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain.") (citation omitted). To determine the parties' reasonable expectations, "the relevant inquiry always will focus on the contract itself, to determine what the parties did agree to." *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986) (quotation marks and citation omitted); *Bike Fashion Corp.*, 46 P.3d at 435 ("the express terms are presumed to be the best indicator of the parties' reasonable expectations").

Two Brothers' claim for violation of the implied covenant rests upon the same alleged oral representations that underlie its breach of contract claim. Two Brothers asserts that Valero violated the implied covenant by not fulfilling those oral representations and by charging Two Brothers more than it charged CST and the Valero-owned stores. Because the Court has already concluded that the oral representations are not part of the DMAs between the parties, Two Brothers cannot show that Valero violated the implied covenant by violating the terms of the DMAs. Nor can Two Brothers prove violation of the covenant by Valero's charging a posted and commercially reasonable price to Two Brothers while charging a more favorable price to customers that were not similarly situated. Two Brothers therefore must rely on a claim that Valero

exercised its price-setting discretion under the DMAs in a way inconsistent with Two Brother's reasonable expectations. *Bike Fashion Corp.*, 46 P.3d at 435.

But Two Brothers cannot claim that the alleged oral representations established its reasonable expectations. The DMAs expressly stated that any previous representations were not part of the final contract. Doc. 115-2 at 126, ¶ 23. While an integration clause cannot remove a party's obligations under the implied covenant of good faith and fair dealing, *Allapattah II*, 61 F. Supp. 2d at 1317, it is relevant to determining a party's reasonable expectations under the contract. And other than the oral representations that the DMAs disavowed, Two Brothers has not identified anything in the contract or trade usage justifying a reasonable expectation that Valero would set its prices at levels comparable to those charged CST or its company-owned stores. Nor does Two Brothers cite any support in the DMAs, or any other evidence besides the oral representations, for a reasonable expectation that Valero would ensure that Two Brothers made a profit.

Perhaps sensing the weakness of Count III, Two Brothers provides only a one-sentence response to Valero's summary judgment argument on that count: "a party cannot hide behind an integration clause to avoid the consequences of a breach of the covenant of good faith and fair dealing." Doc. 134 at 13. True, but Two Brothers bears the obligation of coming forward with evidence showing that Valero acted in a way that defeated Two Brothers' reasonable expectations under the DMAs. Because Two Brothers has not done so, the Court will enter summary judgment on this claim.

### D. Count IV – Tortious Interference with Economic Advantage.

Two Brothers argues that Valero committed tortious interference with economic advantage by intentionally "engaging in the unfair pricing activities alleged" in the complaint and "thereby disrupting the relationships between Two Brothers and the [Station Plaintiffs] and their respective abilities to realize a profit [from] the sale of fuel." Doc. 29 at 21-22, ¶ 98. Two Brothers further alleges that Valero's actions were taken with the purpose of promoting its company-owned stations and favored purchaser, CST,

as well as to drive Two Brothers out of the market so Valero could acquire Two Brothers' share of the Phoenix market. *Id.* at 22, ¶ 99; Doc. 134 at 21.

A plaintiff making this claim must establish: "(1) the existence of a valid business expectancy; (2) the interferer's knowledge of the business expectancy; (3) the interferer intentionally induced or caused termination of the business expectancy; and (4) damage suffered as a result of termination of the business expectancy." *Dube v. Likins*, 167 P.3d 93, 99 (Ariz. Ct. App. 2007). Further, "[i]f the interferer is to be held liable for committing a wrong, his liability must be based on more than the act of interference alone. Thus, there is ordinarily no liability absent a showing that defendant's actions were improper as to motive or means." *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1043 (Ariz. 1985) (superseded by statute as to an unrelated portion of the opinion); *accord Miller v. Hehlen*, 104 P.3d 193, 202 (Ariz. Ct. App. 2005) (interference must be improper). Valero argues that this claim fails because Two Brothers cannot present evidence showing the existence of a business expectancy or that Valero's conduct was improper. Doc. 113 at 21; Doc. 144 at 13.[9]

Two Brothers alleges the following business expectancy: Valero would sell fuel to Two Brothers at prices that would allow Two Brothers to sell the fuel to the Station Plaintiffs at prices that would allow the Station Plaintiffs to set retail prices that would maximize their volume and thus increase Two Brothers' profits. Doc. 134 at 21. For several reasons, the Court does not find this to be a valid business expectancy.

First, the interference must be with a prospective relationship between the plaintiff and another party. *See Wagenseller*, 710 P.2d at 1041; *Dube*, 167 P.3d at 99; Restatement (Second) of Torts § 766B. "Before recovery can be had for interference with prospective business relations or for preventing a contract, it must appear that a relationship or contract would otherwise have been entered into." *Marmis v. Solot Co.*, 573 P.2d 899, 902 (Ariz. Ct. App. 1977); *Dube*, 167 P.3d at 101 ("[T]here must be a

---

[9] Valero also argues that Two Brothers has not shown proof of damages, and that Two Brothers and the Station Plaintiffs are essentially a single entity and cannot show that Valero interfered in any contractual relationship between them. Doc. 113 at 19. The Court need not reach these arguments.

colorable economic relationship between the plaintiff and a third party with the potential to develop into a full contractual relationship.") (citations omitted). Two Brothers has not alleged any prospective relationship that it was unable to form because of Valero's pricing. It argues that it hoped to sell fuel to a hypothetical Valero-branded station opened by one of the Station Plaintiffs, Springwells & I-75, but this station was never opened or branded. Doc. 136 at 38, ¶ 155. It provides no other evidence of a prospective business relationship.[10]

Second, tortious interference claims are intended to protect only the "reasonable expectations" of parties. *Bar J Bar Cattle Co. v. Pace*, 763 P.2d 545, 548 (Ariz. Ct. App. 1988). A plaintiff must allege "facts showing the expectancy constitutes more than a mere 'hope.'" *Dube*, 167 P.3d at 99. A desire for prices that would "increase profits" is not a concrete business expectancy. The parties do not dispute that the prices set by Valero were commercially reasonable. Two Brothers does not cite any case showing that an expectation of profit, let alone a certain level of profit, is a reasonable business expectancy. Whether a company makes a profit depends on a variety of factors independent of the price set by Valero. Moreover, as discussed above, nothing in the DMAs or the parties' course of performance or course of dealing supports an expectation that Valero would set its prices at the same level as the prices charged CST or its own company-owned stores.[11] It is also noteworthy that Two Brothers' own experts have

---

[10] Arizona recognizes a separate but related cause of action for intentional interference with contract. *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1025 (Ariz. 2005). That cause of action contains the same elements as intentional interference with business expectancy, except that instead of showing the existence of a valid business expectancy, the plaintiff must show the existence of a valid contractual relationship. *Id.* Interference can be shown if the "defendant causes a party's performance under the subject contract to be more expensive or burdensome." *ABCDW LLC v. Banning*, 388 P.3d 821, 831 (Ariz. Ct. App. 2016). But even if Two Brothers' claim is construed to mean that Valero made the performance of Two Brothers' contracts with the Station Plaintiffs' more expensive and burdensome, Two Brothers has failed to make that showing. Rather, it has shown only that it did not obtain the profits it expected.

[11] To show that it had more than a mere hope of profit, Two Brothers cites to conclusions in the statement of facts that are unsupported by anything but Saad's similarly conclusory statements in his declaration. *See* Doc. 134 at 21 (citing Doc. 136 at 37, ¶¶ 142-44).

indicated that Two Brothers would act as a "pass-through entity" and thus would not profit from the Station Plaintiffs. *See* Doc. 113 at 21; Doc. 133 at 13-14. Thus, Two Brothers has not presented evidence to support a valid business expectancy that Valero would set prices in a way that would allow Two Brothers to make an increased but unspecified profit.

Nor has Two Brothers alleged facts to show that Valero's price setting was improper. The Restatement (Second) of Torts § 767 identifies several factors for courts to consider when determining if an act of interference is improper:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Wagenseller*, 710 P.2d at 1042 (quoting the Restatement § 767). "Factors deserving the most weight are the nature of the actor's conduct and the actor's motive." *Wells Fargo Bank*, 38 P.3d at 32; *accord Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1027 (Ariz. 2005). The plaintiff bears the burden of showing that the defendant's conduct was improper and that the defendant had the necessary intent to interfere with the business expectancy. *See Wagenseller*, 710 P.2d at 1043 ("If the plaintiff is unable to show the impropriety of the defendant's conduct . . . the conduct is not tortious."). Importantly, Arizona courts have noted that whether conduct is improper is an "amorphous standard," and that it should be applied with caution, especially "where the conduct in question takes place in the context of competitive business activities." *See Bar J Bar Cattle Co.*, 763 P.2d at 547.

With respect to the first factor, Two Brothers has not provided any evidence that Valero engaged in discriminatory pricing. The fact that Valero may have made different deals with CST stores or transferred fuel to its company-owned stores at different rates does not show that Valero's conduct was improper. As the Court has found, Valero

charged Two Brothers the listed rack price, minus discounts – a price that Two Brothers concedes was commercially reasonable – and CST and the company-owned stores were not similarly situated.

As to the second factor, Two Brothers provides only a bare allegation of improper motive without any supporting evidence. Two Brothers has not shown that Valero or CST attempted to take over the closed Two Brothers stations or that Valero-owned or CST stores expanded to take over Two Brothers' market share. What is more, although Two Brothers asserts that CST is Valero's "favored customer," it provides no explanation or support for this assertion. It does not show that selling fuel to CST was more profitable for Valero than selling to Two Brothers. And to the extent that Valero may have been trying to promote its company-owned stores, Arizona courts have made clear that "a competitor does not act improperly if his purpose at least in part is to advance his own economic interests." *Miller v. Hehlen*, 104 P.3d 193, 202 (Ariz. Ct. App. 2005) (citation omitted); *accord Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs. Inc.*, 164 P.3d 691, 695 (Ariz. Ct. App. 2007) ("A business-driven motive, in and of itself, is not an improper motive.").

The third factor also favors Valero. Valero's price setting did not deprive Two Brothers of interests that were protected by the DMAs or reasonable business expectations. Arizona law and the DMAs guaranteed Two Brothers a commercially reasonable and non-discriminatory price, set by Valero in good faith. Two Brothers has not provided evidence to show that it did not receive such a price.

The fourth factor weighs in favor of Valero. As the cases cited above observe, actors in industries that commonly utilize open price terms should be able to set those prices in a commercially reasonable range without exposing themselves to litigation. *E.g., HRN, Inc.*, 144 S.W.3d at 435. To find otherwise would impose a significant burden on those industries.

With respect to the fifth factor, Valero set a price that directly impacted the profit experienced by Two Brothers and the Station Plaintiffs, but that price was undoubtedly not the only factor affecting profits. It was also a commercially reasonable price.

With respect to the sixth factor, Valero and Two Brothers are contracting parties, and Valero has a duty to set prices for Two Brothers in good faith. While Valero owned its own stores, it also acted as a competitor of Two Brothers. Valero did not have any fiduciary duties with respect to Two Brothers.

Balancing these factors, with special emphasis on the first two, the Court concludes that Two Brothers has not met its burden of presenting evidence that Valero's price setting was improper. The Court will grant summary judgment on this claim.

### E.    Count V – Robinson-Patman Act.

Two Brothers claims that Valero violated the RPA by charging Two Brothers a higher price than CST. Doc. 29 at 23, ¶ 107. Section 2 of the Clayton Act, as amended by the RPA, provides:

> It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality, . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

The Supreme Court has identified three categories of competitive injury that may give rise to a claim under the RPA. *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006). Only the second category applies here – "price discrimination that injures competition among the discriminating seller's customers."[12] *Id.* To establish such a second-category claim, a plaintiff must show "(1) sales in

---

[12] The first category – the "primary line" cases – entails conduct "that injures competition at the level of the discriminating seller and its direct competitors." *Volvo Trucks N. Am., Inc.*, 546 U.S. at 176. The third category or "[t]ertiary-line cases involve injury to competition at the level of the purchaser's customers." *Id.*

interstate commerce; (2) products of the same grade and quality; (3) discrimination in price between two buyers; and (4) injury." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1187 (9th Cir. 2016) (citing *Volvo Trucks*, 546 U.S. at 176-77); *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 556 (1990) (noting that it is the plaintiff's burden to establish the elements for a violation of the RPA).

The third element – price discrimination – generally refers to a difference in price for the same goods. *F.T.C. v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549 (1960). The Ninth Circuit has made clear, however, that a price difference will constitute price discrimination "only to the extent that the differentially priced product or commodity is sold in a 'reasonably comparable' transaction." *Aerotec Int'l, Inc.*, 836 F.3d at 1188; *accord Tex. Gulf Sulphur Co. v. J. R. Simplot Co.*, 418 F.2d 793, 806 (9th Cir. 1969) (the RPA "proscribes unequal treatment of different customers in comparable transactions"). More specifically, "a seller is not obligated to charge the same prices for a commodity if its sales contracts with different buyers contain materially different terms[.]" *Aerotec Int'l, Inc.*, 836 F.3d at 1188. Materially different terms may be found if there are significant differences in the length of the contract or the obligations it imposes. *See id.* (finding a material difference between sales made according to stable, long-term contracts and sales made in a "spot market"); *id.* at 1189 (finding a material difference in terms when one contract imposed "substantial obligations" in the form of payment of license and royalty fees, maintenance of insurance, and exclusivity, while such compliance requirements were not found in the competitor's contract).

As discussed above, material differences exist between Valero's contract with CST and its contract with Two Brothers. CST's Master Agreement is five times longer than the DMAs, required CST to purchase approximately 100 times more fuel than Two Brothers for sales in 100 times more stores, and involved markets far larger and far beyond Two Brothers' operation in Maricopa County. Two Brothers has not shown price discrimination. *See Tex. Gulf Sulphur*, 418 F.2d at 806 ("A discrimination under the Robinson-Patman Act does not come about where differences in price terms or conditions

between several transactions result from diverse market conditions rather than from an intent to discriminate. The trial court found that no discriminations occurred or were likely to occur because the differences between the various contracts were not the product of an intent to discriminate but resulted from diverse market conditions in the absence of a prohibited competitive effect."). The Court will grant summary judgment on the RPA claim.

### F. Conclusion.

The gravamen of Two Brothers' complaint is that Valero did not honor oral representations made before the 2007 DMA was signed, but for all of the reasons explained above, those alleged oral representations are not part of the parties' agreements or reasonable expectations. Nor can Two Brother prevail on its argument that Valero wrongly charged it more than CST and the company owned stores. Two Brothers does not dispute that it was charged a publicly posted and commercially reasonable price, and CST and the Valero stores were not similarly situated. In light of this conclusion, the Court need not address Valero's other arguments.

## IV. The Station Plaintiffs' Claims.

The Station Plaintiffs never entered into any contract with Valero. As a result, they do not assert claims for breach of contract, bad faith under A.R.S. § 47-2305, or breach of the covenant of good faith and fair dealing. Their complaint does, however, assert claims of tortious interference and violation of the RPA.

The Station Plaintiffs now concede that they do not have standing to bring the RPA claim because they did not purchase fuel from Valero. Doc. 135 at 2. Station Plaintiff TB IV additionally concedes that its tortious interference claim is barred by the statute of limitations because it stopped operating in December 2011 and the complaint was not filed until May 20, 2015. *Id.*

The remaining Station Plaintiffs make the same arguments as Two Brothers in support of their tortious interference claim. For the reasons set forth above, the Court will grant summary judgment on that claim.

**IT IS ORDERED:**

1.    Valero's motions for summary judgment (Docs. 113, 114) are **granted**.

2.    All other pending motions are **denied as moot**.

3.    The Clerk is directed to enter judgment in favor of Defendant and terminate this case.

Dated this 19th day of September, 2017.

_____
David G. Campbell
United States District Judge